**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ILLINOIS RESTAURANT ASSOCIATION** | ) | |
| **and A.N.A.C, d/b/a ALLEN'S NEW** | ) | |
| **AMERICAN CAFÉ,** | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | 06 C 7014 |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Foie gras, or "fatty liver," is produced using the French practice of gavage, which involves feeding ducks or geese with the goal of fattening their livers. The practice dates back to at least Roman times, when Pliny the Elder wrote of the practice of feeding geese dried figs to enlarge their livers. Pliny the Elder, Natural History, Book VIII, Ch. 77 (Teubner ed. 1909). In the nineteenth century, the debate over the propriety of the practice continued, as Jean Anthelme Brillat-Savarin sided with the geese and ducks, writing that "[t]hey have not only been deprived of the means of reproduction, but they have been kept in solitude and darkness, and forced to eat until they were led to an unnatural state of fatness." Physiologie du goût (The Physiology of Taste), sec. III (1825). On the other hand, his contemporary, Charles Gerard, called the goose "an instrument for the output of a marvelous product, a kind of living hothouse in which there grows the supreme fruit of gastronomy." Charles Gérard, L'Ancienne Alsace à table (1862).

The debate rages on today, as the City of Chicago entered the fray in 2006 by enacting an ordinance banning the sale of foie gras at food dispensing establishments in the City. The Illinois Restaurant Association and Allen's New American Café sued the City in state court, claiming that the foie gras ordinance exceeded the City's police powers under the Illinois Constitution.

The City removed this action after the plaintiffs amended their complaint to add a Commerce Clause claim arising under the federal Constitution. The City's motion to dismiss for failure to state a claim is before the court. For the following reasons, the court finds that the foie gras ordinance is consistent with the Illinois and United States Constitutions. Thus, the City's motion to dismiss for failure to state a claim is granted in its entirety.

## I.  Background

The court will accept the allegations in the complaint as true for the purposes of the City's motion to dismiss. On April 26, 2006, the City Council enacted Ordinance PO-05-1895 ("the Ordinance"), which became effective on August 23, 2006. First Amended Complaint ("FAC") at ¶ 22, Ex. 1. The Ordinance amends the City's Municipal Code to add a section prohibiting the sale of foie gras at "food dispensing establishments" within the City and provides that any business that violates the Ordinance is subject to a fine of between $250 and $500 per offense. FAC Ex. 1, §§ 7-39-001.1, 7-39-005.[1]

The City of Chicago is a home rule unit under the 1970 Illinois Constitution. *Id*. at ¶ 1. Plaintiff Illinois Restaurant Association is an Illinois non-profit organization consisting of member restaurants, and its mission is to advocate the interests of its members in order to advance their economic interests. *Id*. at ¶ 18. A number of these restaurants – including plaintiff A.N.A.C. d/b/a Allen's New American Café – are located in Chicago and, but for the Ordinance, would have continued to offer dishes containing foie gras to their patrons. *Id*. at ¶¶18-19.

---

[1] Chicago's Municipal Code defines a "food dispensing establishment" as "any fixed location where food or drink is routinely prepared and served or provided for the public for consumption on or off the premises with or without charges." Mun. Code of the City of Chicago § 4-8-010. Restaurants are a type of food dispensing establishment. *See id*.

Foie gras is not produced in Chicago or Illinois. *Id*. at ¶ 27. Instead, it is produced domestically at farms in California and New York and is produced and imported into the United States from farms in Canada and France. *Id*. ¶ 28. The production of foie gras in these out-of-state and foreign locations is lawful, and imported foie gras is subject to federal tariffs and other federal regulations allowing its importation for sale into the United States. *Id*. at ¶ 30, 33. Furthermore, the United States Department of Agriculture ("USDA") has found that foie gras is safe for human consumption. *Id*. at ¶¶ 3, 58.

The parties offer differing characterizations of the City Council's motives for passing the Ordinance. According to the plaintiffs, the City Council has never advanced any health, consumer protection, or fraud bases as justification for the Ordinance and no such justifications exist. *Id*. at ¶¶ 35- 38. Instead, the Ordinance is a "moral statement" which was passed "because of the purportedly inhumane manner in which foie gras is *produced*." *Id*. at ¶ 59, 4 (emphasis in original).

On the other hand, the City points to the "WHEREAS" clauses of the Ordinance, which note the City Council's recognition that "the media has shed light on the unethical practices of the care and preparation of the livers of birds." FAC Ex. 1. The City Council specifically focused upon the practice during which "[b]irds, in particular geese and ducks, are inhumanely force fed, via a pipe inserted through their throats several times a day, in order to produce a rare delicacy, foie gras, for restaurant patrons." *Id*. With respect to that practice, the City Council identified a recent survey showing that nearly 80 percent of Americans oppose the treatment of geese and ducks whose livers become foie gras. *Id*.

The City Council also recognized that the City "is home to many famous restaurants offering the finest cuisine and dining experiences to their customers," and that "[m]illions of people visit Chicago every year, attending cultural events and dining in our legendary restaurants." *Id*. The City Council then expressed its view that "[t]he people of Chicago and those who visit here have come to expect, and rightfully deserve, the highest quality in resources, service and fare" and concluded that "[b]y ensuring the ethical treatment of animals, who are the source of the food offered in our restaurants, the City of Chicago is able to continue to offer the best in dining experiences." *Id*. The City then passed the Ordinance. *Id*.

The plaintiffs sued the City in state court, claiming that the Ordinance exceeded the City's home rule powers under the Illinois Constitution. The City removed this action after the plaintiffs amended their complaint to add a commerce clause claim arising under the United States Constitution. The City presently seeks to dismiss the complaint in its entirety under Rule 12(b)(6), contending that it fails as a matter of law to state a claim for which relief may be granted.

## II.    Discussion

### A.    Standard for a Rule 12(b)(6) Motion to Dismiss

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *See, e.g., McMath v. City of Gary*, 976 F.2d 1026, 1031 (7th Cir. 1992). Dismissal is properly granted only if it is clear that no set of facts which the plaintiff could prove consistent with the pleadings would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). However, the court is neither bound by the

plaintiff's legal characterization of the facts, nor required to ignore facts set forth in the complaint that undermine the plaintiff's claims. *Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992).

### B.     The Illinois Constitution – Home Rule

The court, unlike the parties, begins by considering whether the Ordinance was properly enacted pursuant to the City's home rule powers under the Illinois Constitution because federal "[c]onstitutional adjudication is a last resort, and courts should do what they can to decide on other grounds." *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1126 (7th Cir. 1995) (district court should have considered whether Chicago's spray paint ban was a valid exercise of home rule powers before addressing whether it violated the United States Constitution).

The plaintiffs contend that the Ordinance exceeds the City's home rule powers because it is not aimed at a legitimate local problem and has an impermissible extraterritorial effect since it is meant to affect the production process of foie gras, which only occurs outside Chicago.  Under the Illinois Constitution of 1970, "a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare . . . ."  Ill. Const. Art. VII, § 6(a).  The City "is a home rule unit of local government under the 1970 Illinois Constitution."  *City of Chicago v. Roman*, 184 Ill.2d 504, 512 (Ill. 1998).  Thus, the Ordinance does not violate the Illinois Constitution if it is within the scope of the City's broad home rule powers.

The court begins with an overview of home rule. The Illinois Supreme Court has emphasized that home rule units have expansive powers. *Id.* ("Section 6(a) gives home rule units the broadest powers possible"); *Schillerstrom Homes, Inc. v. City of Naperville*, 198 Ill.2d 281, 287 (Ill. 2001) (same). Because home rule powers are "broad and imprecise in order to allow for great flexibility," *City of Evanston v. Create, Inc.*, 85 Ill.2d 101, 107 (Ill. 1981), a home rule unit's powers and functions "shall be construed liberally." Ill. Const. 1970 art. VII, § 6(m). Moreover, a home rule unit "has broad discretion to determine not only what the public interest and welfare require, but to determine the measures needed to secure such interest." *Chicago Nat'l League Ball Club, Inc. v. Thompson*, 108 Ill.2d 357, 364 (Ill. 1985).

Because a home rule unit's powers are so broad, the constitutionality of its ordinances does not turn on a court's assessment of their wisdom or desirability. *See Village of Glenview v. Ramaker*, 282 Ill. App. 3d 368, 371 (1st Dist. 1996) ("Courts will not disturb an exercise of police power merely because there is room for a difference of opinion about the wisdom or necessity of its exercise"). Nevertheless, an ordinance enacted by a home rule unit must address a local problem, as opposed to a problem arising at the state or national level. *Village of Bolingbrook v. Citizens Utilities Co.*, 158 Ill.2d 133, 138 (Ill. 1994). A problem can be local in nature even if it is also a state or national issue. *See Scadron v. City of Des Plaines*, 153 Ill.2d 164, 175 (Ill. 1992) (regulation of outdoor advertising promoted traffic safety and aesthetics and thus was a permissible use of home rule power even though "the proliferation of billboards may be a national and State problem"); *City of Evanston v. Create, Inc.*, 85 Ill.2d 101, 111-14 (Ill. 1981) ("[t]he mere existence of State interest and activity in a particular field does not alone

preclude home rule activity" so Evanston's landlord-tenant ordinance was a permissible use of home rule power because Evanston had an interest in regulating leases).

When determining whether an ordinance has a sufficient local angle for the purposes of home rule, the court must consider "[1] the nature and extent of the problem, [2] the units of government which have the most vital interest in its solution, and [3] the role traditionally played by local and statewide authorities in dealing with it." *Kalodimos v. Village of Morton Grove*, 103 Ill.2d 483, 501 (Ill. 1984). With these basic principles in mind, the court turns to the plaintiffs' overlapping claims that the Ordinance is not aimed at a local problem and has an impermissible extraterritorial effect.

### 1. The Nature and Extent of the Problem

The Ordinance addresses sales of foie gras in Chicago and thus addresses a local aspect of the more general question as to whether foie gras should be available at the state or national level. *See Village of Bolingbrook v. Citizens Utilities Co. of Illinois*, 158 Ill.2d at 139-41 (despite existence of state laws governing the disposal of waste and sewage, Bolingbrook's ordinance assessing fines based on the disposal of certain sewage was a proper exercise of its home rule powers because it had the authority to regulate within its boundaries). This is so even though foie gras sales are lawful elsewhere, as the fact that conduct is lawful outside the jurisdiction does not bar a home rule unit from enacting legislation which controls conduct inside its borders. *Kalodimos v. Village of Morton Grove*, 103 Ill.2d at 503-05 (Morton Grove's handgun ban addressed local problem because it did not regulate conduct outside of its boundaries).

Similarly, the federal government's regulation of the safety of foie gras consumption does not preempt regulation of sales at the local level because Chicago is not enacting legislation directed at whether foie gras is fit for consumption. *See id*. at 503 (local governments may enact their own solutions to problems "in the face of less stringent or conflicting State regulation, following a determination that the State's expression of interest in the subject as evidenced by its statutory scheme did not amount to an express attempt to declare the subject one requiring exclusive State control"); *Scadron v. City of Des Plaines*, 153 Ill.2d at 186 ("home rule units may exercise any nonexclusive power concurrently with the state, provided such power has not been specifically limited").

Moreover, the Ordinance states that because the vast majority of Americans oppose foie gras production, banning foie gras will enhance the reputation of restaurants in Chicago. Contrary to the plaintiffs' position, the City's expressed desire to use a foie gras ban to make a statement about the methods used to produce foie gras is a local interest since local political bodies traditionally enact legislation reflecting the perceived desires of their constituency, and the Ordinance reflects the City Council's belief that a majority of Chicagoans want to ban foie gras sales in Chicago. *See City of Evanston v. Create, Inc.*, 85 Ill.2d at 113-14 ("the local governing body can create an ordinance specifically suited for the unique needs of its residents and is keenly and uniquely aware of the needs of the community it serves").

The Ordinance thus reflects the City Council's judgment that banning the sale of foie gras would benefit the City and advance the morals of the community. The court cannot sit as a superlegislature and determine if, in its judgment, the City Council was correct. *Chicago Nat. League Ball Club, Inc. v. Thompson*, 108 Ill.2d at 364 ("the legislature has broad discretion to

determine not only what the public interest and welfare require, but to determine the measures needed to secure such interest"); *Village of Glenview v. Ramaker*, 282 Ill.App.3d 368, 371 (1st Dist. 1996) (declining to strike down an ordinance prohibiting residents from keeping swine within village because, among other things, "[c]ourts will not disturb an exercise of police power merely because there is room for a difference of opinion about the wisdom or necessity of its exercise"). In other words, the Ordinance's constitutionality does not depend on whether the court or the parties agree as to its wisdom. *See id.* The plaintiffs' numerous arguments regarding the desirability of a foie gras ban are, therefore, beside the point.

   **2.**  **Who Has the Most Vital Interest in the Problem and Who Traditionally Deals With The Problem**

   The court next considers whether the Chicago City Council is the unit of government with the most vital interest in solving the problem at the heart of the Ordinance. Because the Ordinance regulates food which may be served in Chicago restaurants and sold in Chicago grocery stores, the Chicago City Council clearly meets this standard. *See Village of Bolingbrook v. Citizens Utilities Co.*, 158 Ill.2d at 139-41. It is also the proper authority to address the problem because it is uniquely situated to govern the conduct of Chicago business establishments. *See id.*

   This is true even if Chicago's ban has effects outside the jurisdiction (such as reducing the national consumption of foie gras), because, as discussed above, a law's potential extraterritorial effects do not cancel out its local aspects and render Chicago powerless to address a perceived local problem. *See Kalodimos v. Village of Morton Grove*, 103 Ill.2d at 504-05 (Morton Grove's ban of operable handguns addressed the local interest of controlling guns even though it had the secondary effect of causing people carrying guns to route themselves around

Morton Grove).  In addition, the City's home rule powers enable it to prohibit the sale of foie gras even though it cannot regulate the production of foie gras outside its borders.  *See id.* ("The grant of home rule powers contemplates that different communities which perceive a problem differently may adopt different measures to address the problem, provided that the legislature has taken no affirmative steps to circumscribe the measures that may be taken and that the measures taken are reasonable").  In this regard, the court notes that the Ordinance governs the sale of foie gras in Chicago, and does not regulate the treatment of ducks or geese located in the United States or elsewhere.

Accordingly, for the above reasons, the court finds that despite the Ordinance's extraterritorial effects, it is a valid exercise of Chicago's home rule powers under the Illinois Constitution because it is aimed at a sufficiently local problem.  It thus reaches the argument to which the parties have devoted most of their energies:  whether the Ordinance violates the United States Constitution.

### C.        The Federal Constitution – The Dormant Commerce Clause

The United States Constitution gives Congress the power to "regulate Commerce with foreign Nations, and among the several States." U.S. Const. Art. I, § 8.  This portion of the Constitution is known as the Commerce Clause.  Although the Commerce Clause does not limit the States' power to regulate commerce, it "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on [interstate] commerce." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 87 (1984).  "This 'negative' aspect of the Commerce Clause is often referred to as the 'Dormant Commerce Clause' and is invoked to invalidate overreaching provisions of state regulation of commerce." *Alliant Energy*

*Corp. v. Bie*, 330 F.3d 904, 911 (7th Cir. 2003); *American Trucking Ass'n v. Mich. Pub. Serv. Commission*, 545 U.S. 429, 433 (2005).

The dormant Commerce Clause is generally analyzed using a two-tier approach. Under the first tier, the court must determine if the law at issue "directly regulates or discriminates against interstate commerce" or if "its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. 93, 99 (1994) (discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter"). Discriminatory laws motivated by "simple economic protectionism" are subject to a "virtually per se rule of invalidity," *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978), which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose, *Maine v. Taylor*, 477 U.S. 131, 138 (1986).

On the other hand, if a law indirectly affects interstate commerce and regulates evenhandedly, the line of cases which form the second tier potentially come into play. These cases require the court to examine whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits"); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, – U.S. –, 127 S.Ct. 1786, 1792-93 (2007) (per Chief Justice Roberts,

with three Justices concurring and one Justice concurring in judgment) (the *Pike* balancing test governs nondiscriminatory laws which are "directed to legitimate local concerns" and have incidental effects on interstate commerce). Under *Pike*, a court must uphold a law "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Id*.

The parties vigorously dispute what analysis is appropriate after the court determines that a law does not directly regulate or discriminate against extraterritorial commerce. The City contends that the *Pike* balancing test is not necessarily used across the board to evaluate all nondiscriminatory laws.[2] If this is the case, the dormant Commerce Clause is not triggered so the law cannot run afoul of the dormant Commerce Clause. The applicability of *Pike* is a central issue which is hotly debated in this case, as the plaintiffs champion the view that a law is either discriminatory or it's not, and if it's not, *Pike* balancing is mandatory. Regrettably, the cases in this area are less than clear. *See West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 210 (1994) (Scalia, J., concurring in the judgment) ("Applying this [the standard two-tier] approach – or at least the second part of it – is not always easy, since once one gets beyond facial discrimination our negative-Commerce-Clause jurisprudence becomes (and long has been) a 'quagmire.'"), *quoting Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959). Nevertheless, for the following reasons, the court finds that the Ordinance does not violate the

---

[2] The City retreats from this position in its supplemental brief addressing the recent *United Haulers* case. However, this court's task is to determine matters of law, so it will consider the reach of *Pike* despite the City's reading of *United Haulers*. *See Hartford Acc. and Indem. Co. v. Sullivan*, 846 F.2d 377, 385 (7th Cir. 1988).

dormant Commerce Clause because it does not regulate or discriminate against interstate commerce and *Pike* balancing is not required.

### 1. Does the Ordinance Directly Regulate or Discriminate Against Extraterritorial Commerce?

As noted above, a law that directly regulates interstate commerce or that treats local economic interests differently from extraterritorial interests in a manner "that benefits the former and burdens the latter" is invalid. *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Oregon*, 511 U.S. at 99. The plaintiffs argue that even though the Ordinance is facially neutral, it was meant to create an economic boycott and thereby negatively affect the foie gras industry, which is located outside Illinois. Thus, the plaintiffs conclude that it regulates extraterritorial interests and, therefore, violates the dormant Commerce Clause. In response, the City contends that the Ordinance merely regulates the sales activity of food dispensing establishments within the City and thus does not regulate interstate commerce.

The court finds that the fact that the Ordinance has an economic effect on out-of-state foie gras production does not mean that it regulates or discriminates against interstate commerce. Specifically, the Ordinance prevents people from ordering foie gras in Chicago restaurants and thus prevents out-of-state foie gras from landing on restaurant diners' plates in Chicago.[3] It thereby chips away at the foie gras producers and distributors' profits. However, it does not govern foie gras production or pricing. Thus, it neither regulates nor discriminates against interstate commerce. *See National Solid Wastes Management Ass'n v. Meyer*, 63 F.3d at 652,

---

[3] Presumably, the Ordinance will have some effect on in-home foie gras consumption but will not stamp it out entirely, since Chicago residents can purchase foie gras outside Chicago and prepare it in their homes.

658 (7th Cir. 1995) (a Wisconsin statute conditioning the use of Wisconsin landfills by non-Wisconsin waste generators on their adoption and enforcement of Wisconsin recycling standards directly regulated interstate commerce because it "impose[d] the requirements of Wisconsin law on numerous waste generators who neither reside, nor dispose of their waste in Wisconsin"); *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. at 579-80 (New York's facially neutral liquor affirmation statute violated the dormant Commerce Clause because it effectively regulated the price of liquor sold out of state by requiring distillers to affirm that they would not sell anywhere in the United States for less than the posted price in New York and thus prevented distillers from reducing their prices in other States during the period that the posted New York price was in effect).

The plaintiffs disagree with this conclusion, arguing that the Ordinance's negative economic effect on out-of-state foie gras production means it discriminates against interstate commerce. In support, they direct the court's attention to *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38 (1st Cir. 1999), *aff'd sub nom. on conflict preemption grounds, Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000). *Natsios* involved a state law restricting the ability of Massachusetts to purchase goods or services from individuals or companies that engage in business with Burma. *Id.* at 45. The First Circuit relied on dormant Commerce Clause principles and held that Massachusetts' law violated the Foreign Commerce Clause because, among other things, it "effectively force[d] businesses to choose between doing business in Burma or with Massachusetts" since it "condition[ed] state procurement decisions on conduct that occurs in Burma." Id. at 67-69. The Ordinance, in contrast, does not force out-of-state foie

gras producers or distributors to do anything: it simply prohibits their product from being sold in Chicago restaurants.

The plaintiffs' reading of *Natsios* is also unpersuasive because it is based on a mischaracterization of the Supreme Court case underlying that decision. Specifically, *Natsios* relied on the Supreme Court's holding that "a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 572 (1996). According to the plaintiffs, this statement means that any laws which negatively affect out-of-state economic interests are facially discriminatory.

This is an overly broad reading of *BMW*. In that case, a dissatisfied consumer in Alabama sued BMW based on its nationwide policy of not advising its dealers, and hence their customers, of predelivery damage to new cars when the cost of repair did not exceed 3 percent of the car's suggested retail price and a jury awarded the plaintiff hefty damages. The Supreme Court held that a statute or regulation is not necessary for asserting a dormant Commerce Clause claim, explaining that "State power may be exercised as much by a jury's application of a state rule of law in a civil lawsuit as by a statute." 517 U.S. at 572 n.17. It then noted that a patchwork of disclosure requirements existed throughout the fifty states and held that Alabama could regulate conduct within its borders but could not enact "legislatively authorized fines" in an effort to alter BMW's nationwide policy where BMW had engaged in out-of-state conduct which was not directed at Alabama residents. *See id*. at 573 ("Alabama may insist that BMW adhere to a particular disclosure policy in that State. Alabama does not have the power, however, to punish BMW for conduct that was lawful where it occurred and that had no impact on Alabama or its

residents. Nor may Alabama impose sanctions on BMW in order to deter conduct that is lawful in other jurisdictions").

Thus, the Supreme Court's decision in *BMW* and the First Circuit's decision in *Natsios* do not stand for the proposition that any law which has an extraterritorial economic effect is per se unconstitutional. Instead, these decisions hold that an economic penalty which is tantamount to "legislatively authorized fines" meant solely to govern out-of-state conduct violates the Commerce Clause. So, does the Ordinance rise to the level of a "legislatively authorized fine" because it is, at least in the plaintiffs' view, meant to negatively impact the economic interests of foie gras producers located out-of-state and in other countries? Such a conclusion is inconsistent with the Supreme Court's statements in *BMW* because an indirect economic effect is not tantamount to a legislative fine. *See Philip Morris, Inc. v. Reilly*, 267 F.3d 45, 64 (1st Cir. 2001), *reh'g en banc on other grounds by* 312 F.3d 24 (1st Cir. 2002) (considering application of the Takings and Due Process Clauses but declining to revisit whether the law at issue violated the Commerce Clause). In addition, the Seventh Circuit has rejected the contention that an out-of-state effect makes a law facially discriminatory. *See Alliant Energy Corp. v. Bie*, 330 F.3d at 547 (rejecting the claim that a statute directly regulates interstate commerce "if it has any extraterritorial effects"). Thus, the court is unconvinced by the plaintiffs' contention that the Ordinance is facially discriminatory because it has extraterritorial economic effects.

The plaintiffs also contend that the Supreme Court's decisions in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), and *Kraft General Goods, Inc. v. Iowa Department of Revenue*, 505 U.S. 71 (1992), show that the Ordinance falls afoul of the dormant Commerce Clause. *Hunt* involved a North Carolina law that required all closed containers of

apples shipped into or sold in North Carolina to display either the U.S. Department of Agriculture grade or no grade. To comply with the law, Washington State apple growers would have had to alter their practice of using the Washington State grading system for interstate shipments of apples into North Carolina. *Id*. at 337-39. The Court held that the law was facially non-discriminatory but nevertheless violated the Commerce Clause because it favored North Carolina apple growers, who would not need to alter their practices and would gain a competitive advantage from the elimination of the Washington State grading system. *Id*. at 350-52.

According to the plaintiffs, the *Hunt* decision means that laws which indirectly regulate extraterritorial commerce violate the Commerce Clause. *Hunt*, however, does not stand for this proposition. Instead, it holds that even if a law is facially neutral, it can still have the practical effect of discriminating against outside interests in favor of local ones. The Ordinance, in contrast, neither favors nor provides advantages or protection to local economic interests. Indeed, there are no such interests to protect since foie gras is only produced outside of Chicago. Thus, the Ordinance does not discriminate in practical effect so *Hunt* is inapposite.

The plaintiffs' reliance on *Kraft General Goods, Inc. v. Iowa Department of Revenue* is similarly unpersuasive. The plaintiffs contend that in *Kraft*, the Supreme Court explicitly rejected the argument that local favoritism is crucial to a finding that a law is facially discriminatory. *See Nat'l Foreign Trade Council v. Natsios*, 181 F.3d at 67, *quoting Kraft General Goods, Inc. v. Iowa Department of Revenue*, 505 U.S. at 79 (under *Kraft*, local favoritism not "an essential element of a violation of the Foreign Commerce Clause . . . . [since] the absence of local benefit does not eliminate the international implications of the discrimination").

The law in *Kraft* imposed a business tax on corporations which allowed corporations to take a deduction for dividends received from domestic subsidiaries but did not allow a credit for taxes paid to foreign countries. It thus "treat[ed] dividends received from foreign subsidiaries less favorably than dividends received from domestic subsidiaries." *Id*. at 75. The Court stated that although the law did not benefit local economic interests, it involved "discriminatory treatment of foreign commerce," and reflected "a preference for domestic commerce over foreign commerce." *Id*. at 79. It then concluded that this discrimination violated the Foreign Commerce Clause even though the law did not benefit local interests.

In other words, in *Kraft*, the Supreme Court did not exclusively consider whether the law at issue benefitted local interests when determining if that law was constitutional. Instead, it looked to whether the law had a discriminatory effect. This court will do likewise. The fact that the Ordinance does not benefit local interests, therefore, is irrelevant for the purposes of the Commerce Clause since, in contrast to the law at issue in *Kraft*, the Ordinance does not discriminate against foreign commerce. For all of these reasons, the court finds that the Ordinance does not directly regulate or discriminate against extraterritorial commerce.

### 2.      The Ordinance's Effect on Interstate Commerce

In *Pike*, a leading Commerce Clause case remembered fondly (or perhaps not) by generations of law students, the Supreme Court held that:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits . . . .  If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

397 U.S. 137, 142.

As noted previously, the parties vigorously dispute whether *Pike* balancing is always required for laws which do not discriminate against interstate commerce expressly or in practical effect. The City's main arrow in its quiver is the Seventh Circuit's decision in *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124 (7th Cir. 1995). In that case, the district court applied *Pike* balancing to a Chicago ordinance banning the sale of spray paint in an effort to stop graffiti. After a bench trial, the district court found that the ordinance violated the Commerce Clause because it had, at best, very limited benefits but would impose a substantial burden on interstate commerce since it would cut off spray paint sales in Chicago.

The Seventh Circuit reversed, explaining that *Pike* does not "[supply] the standard for all laws affecting commerce." *Id*. at 1131. Instead, laws fall into three categories: (1) those which explicitly discriminate against interstate commerce (*e.g.*, a law banning the sale of spray paint manufactured outside Illinois); (2) those which are facially neutral but "bear more heavily on interstate commerce than local commerce (*e.g.*, a law which sets a 55-foot limit for trailers when all nearby states set a 65-foot limit); and (3) those which are facially neutral and "do not give local firms any competitive advantage over those located elsewhere." *Id*.

The Seventh Circuit held that Chicago's spray paint ordinance fit in the third category because it would curtail sales to law-abiding persons without affecting the vandals responsible for graffiti and thus would decrease the volume of spray paint moving into Illinois. It then asked whether this decrease would benefit Illinois firms and answered "no" because Chicago retailers would lose profits from spray paint sales. It also asked if the ordinance would have a disparate effect on manufacturers and middlemen, and again answered "no" because consumers would not

favor in-state suppliers once the ban went into effect. *Id*. at 1131-32. Finally, it concluded that *Pike* balancing was unnecessary because the spray paint ban "affects interstate shipments, but it does not discriminate against interstate commerce in either terms or effect. No disparate treatment, no disparate impact, no problem under the dormant commerce clause." *Id*. at 1132; *id*. at 1134 (Rovner, J., concurring) (the *Pike* balancing test was inapplicable because the plaintiffs did not allege that after the ban, Chicago consumers would turn to alternate products produced primarily in Chicago or Illinois); *see also K-S Pharmacies, Inc. v. Am. Home Prods. Corp.*, 962 F.2d 728, 731 (7th Cir. 1992) ("Courts demand more than hypothetical rationality of statutes only when the laws create a differential burden on interstate commerce"); *Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d 496, 505 (7th Cir. 1989) (rejecting the plaintiffs' contention that because a law unreasonably injures investors, most of whom live outside of Wisconsin, it must violate the dormant Commerce Clause); *Procter & Gamble Co. v. City of Chicago*, 509 F.2d 69 (7th Cir. 1975) (*Pike* "does not mechanically compel a weighing process in every case).

    *National Paint* appears, at first blush, to sound the death knell to the plaintiffs' dormant Commerce Clause claim because it is undisputed that the Ordinance at issue in this case does not "discriminate against interstate commerce in either terms or effect" since no foie gras is produced in Illinois and the plaintiffs do not allege that Chicago shoppers and restaurant customers, thwarted of their ability to purchase foie gras, will turn to Illinois-produced substitutes. Moreover, the ordinance at issue in *National Paint* is substantially similar to Chicago's foie gras ban, since both ordinances banned a product produced exclusively outside Chicago and it is undisputed that Chicago consumers of spray paint and foie gras would not turn to a locally produced replacement product in the face of a ban.

The plaintiffs, however, argue that *National Paint* is an outlier which does not represent the Seventh Circuit or Supreme Court's position vis-a-vis *Pike*. It is true that numerous Seventh Circuit and Supreme Court decisions consistently state that laws can either be discriminatory or nondiscriminatory, and that *Pike* balancing comes into play when a law is nondiscriminatory. *See, e.g.*, *Alliant Energy Corp. v. Bie*, 330 F.3d. at 911 (the *Pike* balancing test applies if a law is evenhanded and has only indirect or incidental effects on interstate commerce); *petition for reh'g denied by* 336 F.3d 545, 547 (7th Cir. 2003) (*Pike* test governs validity of a law which has "indirect and evenhanded incidental effects on interstate commerce and extraterritorial transactions"); *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. at 99 (*Pike* balancing applies to nondiscriminatory regulations with incidental effects on interstate commerce); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 (1981) ("Even if a statute regulates 'evenhandedly,' and imposes only "incidental" burdens on interstate commerce, the courts must nevertheless strike it down if 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'"), *quoting Pike v. Bruce Church, Inc.*, 397 U.S. at 142. Indeed, *Pike* itself says that it applies to laws which regulate even-handedly and have only incidental effects on interstate commerce. 397 U.S. at 142.

Notably, however, the Supreme Court has provided a bit more guidance as to when the *Pike* balancing test kicks in by focusing in on the difference between discriminatory and nondiscriminatory laws. Specifically, in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 126-27 (1978), the law at issue prevented producers or refiners of petroleum products from operating retail service stations within the state of Maryland. Because there were no local producers or refiners of petroleum products, the law placed a new regulatory burden exclusively

on out-of-state companies. *Id*. The Court found that the law was constitutional because it did not benefit any in-state companies and did not impose an undue burden on interstate commerce, explaining that "the [Commerce] Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id*. at 127.

Similarly, in *General Motors Corp. v. Tracy*, the Court acknowledged that the line between discriminatory and nondiscriminatory laws can be blurry because "several cases that have purported to apply the undue burden test (including *Pike* itself) arguably turned in whole or in part on the discriminatory character of the challenged state regulations." 519 U.S. 278, 299 n.12 (1997) (collecting cases). The Court also noted that "a small number of our cases have invalidated state laws under the dormant Commerce Clause that appear to have been genuinely nondiscriminatory, in the sense that they did not impose disparate treatment on similarly situated in-state and out-of-state interests, where such laws undermined a compelling need for national uniformity in regulation." *Id*. It then concluded that "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." *Id*. at 300.

In addition, the Supreme Court very recently stated in *United Haulers* that *Pike* balancing was required if a law did not discriminate against interstate commerce, but then promptly proceeded to focus on whether the law at issue had "*any* disparate impact on out-of-state as opposed to in-state businesses." 127 S.Ct. at 1797 (emphasis in original). *United Haulers*, therefore, is yet another case that recites the *Pike* standard in connection with a facially non-discriminatory law but, in the same breath, looks to whether the law has any discriminatory

effects.  *See General Motors Corp. v. Tracy*, 519 U.S. 299-300 (discussing conflicting Supreme Court precedent applying *Pike*).  In this case, of course, it is undisputed that the Ordinance cannot have any effect on in-state interests since no foie gras is produced in Illinois.

It thus appears that the Supreme Court has itself recognized (albeit in a less than straightforward way) that the dormant Commerce Clause applies to nondiscriminatory laws only where the law has some sort of discriminatory effect or when judicial intervention is necessary to promote national uniformity and thereby prevent discrimination.  *See id.*; *General Motors Corp. v. Tracy*, 519 U.S. at 299-300; *Exxon Corp. v. Governor of Maryland*, 437 U.S. at 126-27 ("[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce" because "the Commerce Clause does not "protect[] the particular structure or methods of operation in a retail market").  This understanding of the dormant Commerce Clause is consistent with the Seventh Circuit's statement in *National Paint* (postdating *Exxon* and predating *General Motors* and *United Haulers*) that "the dormant commerce clause does not replace the rational-basis inquiry with a 'broader, all-weather, be-reasonable vision of the Constitution . . . . Although *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), sometimes is understood to authorize such general-purpose balancing, a closer examination of the cases may support the conclusion that the Court has looked for discrimination rather than for baleful effects." 45 F.3d at 1131, *quoting Amanda Acquisition Corp. v. Universal Foods Corp.*, 877 F.2d at 505.  The court thus concludes that *Pike* balancing is not necessary in all cases and, more specifically, is not necessary in this case.  This means that the Ordinance does not violate the dormant Commerce Clause.

The court acknowledges that, as discussed above, this conclusion is in tension with other Supreme Court and Seventh Circuit cases which do not delve into the details of the dormant Commerce Clause but instead merely repeat the oft-stated maxim that *Pike* applies to nondiscriminatory laws with incidental effects upon interstate commerce. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 127 S.Ct. at 1797. This court's task, however, is not to rewrite the Supreme Court and Seventh Circuit's admittedly contradictory pronouncements about the dormant Commerce Clause. Instead, the court must interpret and reconcile those pronouncements to the best of its ability.

Thus, to sum up, the court finds that for the reasons discussed above, Seventh Circuit and the Supreme Court precedent prevent it from accepting the plaintiffs' invitation to act as a superlegislature and opine as to the wisdom of the Ordinance. The court also finds that the Ordinance does not require it to engage in *Pike* balancing. Because the Ordinance is not facially discriminatory and *Pike* balancing is inapplicable, the Ordinance does not violate the dormant Commerce Clause. The City's motion to dismiss the plaintiffs' dormant Commerce Clause claim is, therefore, granted.

### 3.     The Dormant Foreign Commerce Clause

The plaintiffs argue that the negative Commerce Clause requires the court to act to prevent "economic Balkanization" and "the retaliatory acts of other States (and foreign nations) that may follow." Response at 16. This may be an attempt to invoke the Foreign Commerce Clause, U.S. Const. art. I, § 8, cl. 3, which provides that "[t]he Congress shall have power to . . . regulate commerce with foreign Nations . . . ." The negative or dormant aspect of the Foreign Commerce Clause protects the federal government's ability to speak with a single voice when

regulating commerce with foreign countries, *see Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434 (1979), and flows from the fact "that discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole," *Kraft General Foods, Inc. v. Iowa Dept. of Revenue and Finance*, 505 U.S. at 79 (the dormant Foreign Commerce Clause precludes a State or local governmental entity from "preferring domestic commerce over foreign commerce" even if the law at issue does not lead to any local benefits). Because the Ordinance treats domestic and foreign foie gras equally, however, the dormant Foreign Commerce Clause is inapplicable.

But perhaps the plaintiffs are really arguing that the dormant Commerce Clause discussed in the preceding section requires the court to police the actions of legislatures to ensure that laws are consistent at the local, national, and international level. The plaintiffs appear to be proponents of uniformity, as they contend that local laws which have an extraterritorial effect violate the dormant Commerce Clause to the extent that they impose economic hardship on foie gras producers in the United States and elsewhere. Foreign economic impact, however, is a burden flowing from the Ordinance and for the reasons discussed in the prior section, it does not show that the Ordinance is facially discriminatory or that the *Pike* balancing test applies to this case. The court also expresses severe reservations about a rule requiring courts to use the dormant Commerce Clause to strike down any local laws which result in inconsistencies on a national or international level. Thus, the court is unpersuaded that any extraterritorial economic effects of the Ordinance in other states or countries mean that it is unconstitutional, either under the dormant Foreign Commerce Clause or, as discussed extensively above, the dormant Commerce Clause.

### III.     Conclusion

The court's sole task is to evaluate the Ordinance's constitutionality.  For the above reasons, it finds that Chicago's ban of foie gras sales in restaurants does not exceed the City's home rule powers or violate the dormant Commerce Clause.  Thus, the Ordinance does not violate the Illinois or United States Constitutions, so the City's motion to dismiss [#9] is granted. The clerk is directed to enter a Rule 58 judgment and to terminate this case from the court's docket.


DATE: June 12, 2007

Blanche M. Manning
United States District Judge